IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

C.R.M.,                                    )
                                           )
                Plaintiff,                 )
                                           )
v.                                         )        Case No. 1:20-cv-00404 (AJT/IDD)
                                           )
UNITED STATES OF AMERICA,                  )
                                           )
                Defendant.                 )
_____)

## **MEMORANDUM OPINION AND ORDER**

In this Federal Tort Claims Act ("FTCA") action, Plaintiff C.R.M. ("C.R.M." or

"Plaintiff"), as administratrix of the estates of her deceased children D.A.M., G.F.M., and S.T.M.

(the "children"),[1] bring this action against the United States ("Defendant") for medical

malpractice allegedly committed by military medical providers.  Specifically, Plaintiff alleges

that Defendant negligently performed her intrauterine insemination during a known period of

ovarian hyperstimulation, which caused a quintuplet pregnancy that resulted in the death of two

fetuses (*in utero* at 19-weeks gestational age) and the three children, who were prematurely born

alive at 23-weeks gestational age, but died shortly after birth.  Plaintiff also claims that

Defendant negligently failed to refer her to an appropriate multifetal obstetric specialist after she

became pregnant.

In response to the Complaint [Doc. 1], Defendant has filed the pending Motion to

Dismiss for Lack of Jurisdiction [Doc. 11] and Motion to Dismiss for Failure to State a Claim

[Doc. 12] (collectively, the "Motions").  In the Motions, Defendant seeks to dismiss the

_____

[1] By Order dated April 13, 2020 [Doc. 5], the Court permitted C.R.M., D.A.M., G.F.M., and S.T.M. to proceed
anonymously.

Complaint on the grounds that (1) the Court lacks subject matter jurisdiction under the *Feres* doctrine based on C.R.M's active duty military status at the time of the alleged malpractice; (2) the children, and therefore the Plaintiff, lack Article III standing to assert the alleged claims based on the alleged pre-conception negligence; (3) none of the children has a cause of action under Virginia law based on the alleged pre-conception negligence; and (4) Plaintiff has failed to allege sufficient facts to state a claim for negligently failing to refer her to an appropriate specialist.

For the reasons discussed below, Defendant's Motion to Dismiss for Lack of Jurisdiction [Doc. 11] is **DENIED** and Defendant's Motion to Dismiss for Failure to State a Claim [Doc. 12] is **GRANTED** as to the failure-to-refer claim and is otherwise **DENIED.**

## I.     BACKGROUND

### A.  Factual Background

Plaintiff alleges the following in the Complaint [Doc. 1] ("Complaint" or "Compl."), which the Court accepts as true for purposes of this Order.  *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555-56 (2007).

During the relevant time period, C.R.M. and her spouse were active duty members of the United States Navy.  Compl. ¶ 9.  On June 22, 2017, a military medical doctor performed an intrauterine insemination on C.R.M. during a known period of ovarian hyperstimulation.  *Id.* ¶ 12.  This insemination procedure performed by this treating physician resulted in C.R.M.'s quintuplet pregnancy.  *Id.* ¶¶ 13, 15, 16.

Between July 21, 2017 and October 5, 2017, while pregnant with the children, C.R.M. and her spouse submitted multiple requests to obtain specialized multifetal care at a facility other than Naval Medical Center Portsmouth, where C.R.M. was being seen.  *Id.* ¶ 17.  These requests,

2

however, were denied by various medical professionals at Naval Medical Center Portsmouth, thereby jeopardizing C.R.M.'s quintuplet pregnancy.  *Id.* ¶¶ 18-19.

On October 22, 2017, C.R.M. experienced a spontaneous abortion of two of her five fetuses at 19-weeks gestational age.  *Id.* ¶ 20.  Following the miscarriage, on November 15, 2017, the remaining three fetuses were born alive at 23-weeks gestational age.  However, shortly after their births, each died due to extreme prematurity.  *Id.* ¶¶ 21-22.

Against this background, C.R.M., on behalf of her three born but deceased children, alleges that Defendant was negligent in four distinct ways that placed the children at a higher risk for their premature birth and subsequent death: (1) her treating physician failed to obtain written informed consent for the intrauterine insemination performed on C.R.M., *id.* ¶ 26; (2) her treating physician did not adequately advised her regarding the risk of a high order pregnancy despite C.R.M.'s efforts to discuss such risks on multiple occasions, *id.* ¶ 25; (3) the intrauterine insemination performed by her treating physician violated established standard of care guidelines issued by the American College of Obstetrics and Gynecology, *id.* ¶ 24; and (4) the staff at Naval Medical Center Portsmouth failed to comply with the appropriate standard of care when they declined to refer C.R.M. to an appropriate high order pregnancy obstetric specialist *id.* ¶ 27.

**B.  Procedural History**

On December 17, 2018, before filing this action, C.R.M. filed, on behalf of each of the children, a Standard Form 95 (SF-95) with the Department of the Navy, Torts Claim Unit ("Navy Torts Claim Unit").  *Id.* ¶ 2; Memo., Ex. 1.  On January 8, 2019, the Navy Torts Claim Unit requested further information, which C.R.M. provided on April 18, 2019 and on April 23, 2019.  *Id.* ¶ 3.  On November 12, 2019, C.R.M. filed an action in this Court, seeking, on behalf of the children's estates, essentially the same relief as sought here.  On February 20, 2020, the

Department of Navy issued to C.R.M. a denial letter, in which it denied Plaintiffs' administrative

claims on the grounds that "the filing of suit terminates administrative adjudication of a claim."

Memo., Ex. 2 (Denial Letter).  On April 10, 2020, pursuant to Federal Rule of Civil Procedure

41(a)(1)(A)(i), C.R.M. dismissed the previously-filed action without prejudice and on the same

day, through counsel, filed this action.

On June 19, 2020, Defendant filed the Motions; on July 6, 2020, Plaintiffs filed their

opposition [Doc. 18] ("Opp."); and on July 15, 2020, Defendant filed a reply to the opposition

[Doc. 24] ("Reply").  A hearing on the Motions was held on July 29, 2020 via Zoom, after which

this Court took the Motions under advisement.

## II.    LEGAL STANDARD

### A.  Federal Rule of Civil Procedure 12(b)(1)

A motion to dismiss under Rule 12(b)(1) challenges the court's subject matter jurisdiction

and requires the plaintiff, as the party asserting jurisdiction, to prove that federal jurisdiction is

proper.  *White v. CMA Const. Co., Inc.* 947, F. Supp. 231, 233 (E.D. Va. 1996) (citing *McNutt v.*

*General Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); *Adams v. Bain*, 697 F.2d 1213,

1219 (4th Cir. 1982)).

A Rule 12(b)(1) motion may challenge subject matter jurisdiction by way of either a

facial challenge or a factual challenge.  A facial challenge asserts that the complaint on its face

"fails to allege facts upon which subject matter jurisdiction can be based."  *White*, 947 F. Supp.

at 233 (quoting *Adams,* 697 F.2d at 1219).  Under such a facial challenge, "the facts alleged in

the complaint are assumed to be true and the plaintiff, in effect, is afforded the same procedural

protection as he would receive under a Rule 12(b)(6) consideration."  *Id*.  Alternatively, a

defendant may assert a factual challenge, contending that the jurisdictional allegations of the

complaint are not true.  *Adams*, 697 F.2d at 1219.  A factual challenge puts the district court's "very power to hear the case" at issue; and the district court is then free to weigh the evidence to determine the existence of jurisdiction.  *Id*.  When such a challenge is made, the jurisdictional facts must be determined with the same procedural safeguards as afforded through a motion for summary judgment.  *See Kerns v. United States*, 585 F.3d 187, 192-93 (4th Cir. 2009).

Here, Defendant makes only a facial challenge to the Court's subject matter jurisdiction, which will be assessed based on the facts alleged in the Complaint.

### B.  Federal Rule of Civil Procedure 12(b)(6)

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the complaint.  *See Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994); *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1994).  When raising a Rule 12(b)(6) challenge, "a plaintiff [must] demonstrate more than 'a sheer possibility that a defendant has acted unlawfully.'"  *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  In other words, "if, after accepting all well-pleaded allegations in the plaintiff's complaint as true . . . it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitled him to relief," then the court must dismiss the claim.  *Hatfill v. The New York Times Co*., 2004 U.S. Dist. LEXIS 27530, 2004 WL 3023003, at *4 (E.D. Va. Nov. 24, 2004) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999)).  In considering a motion to dismiss, "the material allegations of the complaint are taken as admitted" and "the complaint is to be liberally construed in favor of plaintiff."  *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969) (citations omitted); *see also Ed. of Trustees v. Sullivant Ave. Properties, LLC*, 508 F. Supp. 2d 473, 475 (E.D. Va. 2007).

Absent allegations sounding in fraud, a Rule 12(b)(6) motion to dismiss must also be assessed in light of Rule 8's liberal pleading standards, which only requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8.  However, while Rule 8 does not require "detailed factual allegations," a plaintiff must still provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (the complaint "must be enough to raise a right to relief above the speculative level" to one that is "plausible on its face"); *see also Giarratano v. Johnson,* 521 F.3d 298, 302 (4th Cir. 2008).  Put another way, the facial plausibility standard requires pleading "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Robertson v. Sea Pines Real Estate Co*., 679 F.3d 278, 287 (4th Cir. 2012) (internal quotations omitted).

### III.    ANALYSIS

### A.  Motion to Dismiss for Lack of Subject Matter Jurisdiction [Doc. 11]

Defendant moves to dismiss the Complaint for lack of subject matter jurisdiction on two separate grounds.  *First*, Defendant argues that the *Feres* doctrine bars each of the claims asserted in the Complaint.  *Second*, Defendant contends that Plaintiff lacks Article III standing to bring claims on behalf of the children based on her treating physician's negligent insemination that pre-dated the children's conception.

#### 1.  *Feres* Doctrine.

The FTCA provides that the United States may be sued for injuries caused by the negligence of federal employees acting within the scope of their employment if a private person would be liable under like circumstances.  28 U.S.C. § 1346(b).  However, despite the FTCA's seemingly broad scope, an active duty servicemember cannot recover under the FTCA for an

6

injury which "arise[s] out of" or is incurred "in the course of activity incident to service."  *Feres v. United States*, 340 U.S. 135, 146 (1950).  Thus, where a claim is barred by the *Feres* doctrine, the FTCA's waiver of immunity does not apply and consequently, a court lacks jurisdiction to adjudicate the claim.  *See Walker v. United States Dep't of the Army*, 60 F. Supp. 2d 553, 556 (E.D. Va. 1999).

In *Feres*, the Supreme Court held that the estate of a soldier killed in a barracks fire while on active duty, allegedly due to Army negligence, could not maintain an action against the United States under the FTCA.  *Id*. at 145.  In so holding, the Court concluded that Congress, in passing the FTCA, never intended to abrogate sovereign immunity in suits by servicemen.  *Id*. Therefore, the Court continued, the United States is not liable under the FTCA for "injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." *Id*. at 146.  To date, the *Feres* doctrine almost uniformly bars servicemembers from recovering for injuries sustained while on active duty.  *See United States v. Stanley*, 483 U.S. 669, 683-84 (1987) (servicemember's FTCA claim seeking to recover for injuries sustained as a result of a secret administration of LSD as part of an Army experiment *Feres*-barred); *Kendrick v. United States*, 877 F.2d 1201, 1203 (4th Cir. 1989) (servicemember's claim that attending military physicians negligently continued to prescribe Dilantin, a drug to address the servicemember's seizure disorder, without properly monitoring the level of medication in his blood *Feres*-barred). Less clear-cut is when the doctrine similarly bars suits raised by civilian dependents of servicemembers.

On the one hand, claims "brought by civilians and civilian dependents of service members who have directly sustained an injury from military personnel are not *Feres*-barred." *Romero v. United States*, 954 F.2d 223, 225 (4th Cir. 1992) (citations omitted) (emphasis added);

*see also Portis v. United States*, 483 F.2d 670, 673 (4th Cir. 1973) (action by civilian child under the FTCA for hearing loss as a result of medical malpractice by Air Force hospital not Feres-barred).  Thus, the *Feres* doctrine does *not* apply where a non-servicemember can demonstrate that the military's alleged negligence was independent of any military need or connection, but rather "directed at preventing injury" to that non-servicemember.  *See, e.g.*, *Romero*, 954 F.2d at 225.

On the other hand, the *Feres* doctrine has barred claims in which a non-servicemember seeks to recover for an injury that arises from or is derivative of an injury suffered by a *Feres*-barred servicemember.  For example, courts have barred non-servicemember's claims for genetic or physical injuries caused by a serviceperson's exposure to radiation or toxins, *see, e.g.*, *Minns v. United States*, 155 F.3d 445 (4th Cir. 1998); *Mondelli v. United States*, 711 F.2d 567 (3rd Cir. 1983); *Lombard v. United States*, F.2d 215 (1982); *Monaco v. United States*, 661 F.2d 129 (9th 1981), or for injuries incurred *in utero* by a rubella vaccination administered to the child's servicemember mother during her pregnancy, *see Scales v. United States*, 685 F.2d 970 (5th Cir. 1982).

In order to determine whether a non-servicemembers' claim is *Feres* barred based on the injuries sustained by a *Feres* barred servicemember, the Fourth Circuit's has adopted the so-called "genesis test."  *See Minns* at 449.  Under that test, a court asks whether "a nonserviceman's injury finds its 'genesis' in the injury suffered by a serviceman incident to service."  *Id*. at 450.  By way of example, the *Minns* court, applying that test, concluded that because the spouses' and children's suits against the military were "based on essentially the same facts as the potential serviceman's suit," *i.e.*, the servicemembers' exposure to toxins in preparation for their service in the first Iraq War, and because "the non-serviceman's suit could

not have happened 'but for' the serviceman's cause of action, [] under the genesis principle[,] the *Feres* doctrine preclude[d] the suit." *Id*. at 449. Relying principally on *Minns*, Defendant contends that because the children's injuries derived from negligence directed at Plaintiff, the children's mother, all of the claims brought on behalf of the children's estates are barred.

As the Fourth Circuit recognized, "[g]enesis cases most notably have arisen in the context of alleged government negligence in exposing service members to radiation or Agent Orange resulting in injury to the fetus or infant." *Romero*, 954 F.2d at 226. As reflected by that context, the genesis test "[i]s intended to address purely derivative injury—civilian injury that derives from a service-related injury to a service person." *Id. See also Hartline v. United States*, 19 F.3d 11 [reported in full at 1994 U.S. App. LEXIS 11441, at *2] (4th Cir. 1994) (affirming district court's holding that the genesis test barred serviceman's wife's wrongful death and survivor action under the FTCA and on behalf of herself and her minor children because her claim was that Army physicians had negligently treated her servicemember husband's cerebral tumor). Here, however, the children's injuries, as in *Romero*, were not caused by or derivative of any injuries inflicted on C.R.M.; and based on the alleged facts in this case, viewed most favorably to the Plaintiff, Plaintiff's claims are not *Feres* barred under the genesis test.

Nor does a direct application of the *Feres* doctrine to the children bar Plaintiff's claims. The Supreme Court has emphasized three broad rationales underlying the *Feres* doctrine: (1) the distinctly federal nature of the relationship between the government and members of the armed forces, (2) the availability of existing alternative compensation schemes in the military, and (3) the fear of damaging military structure and discipline. *See Stencel Aero Engineering Corp. v. United States*, 431 U.S. 666, 671-73 (1977). Based on these considerations, the *Feres* doctrine does not apply.

*First*, the children's relationship with the military does not present the same tension between application of state and federal laws presented by a military servicemember's claim; and though civilian dependents of servicemembers are subject to some military rules and privy to some military privileges, the relationship between the children and the government is not "distinctively federal." *Second*, the children's estates have no remedy for their injuries other than through their claims against the military. *Third*, and finally, it is unlikely that this action will impair the discipline necessary for effective military service. As the Supreme Court has explained, suits brought by servicemembers against the military for "service-related injuries could undermine the commitment essential to effective service and thus have the potential to disrupt military discipline in the broadest sense of the word." *United States v. Johnson*, 481 U.S. 681, 688 (1987); *see also Chappell v. Wallace*, 462 U.S. 296 (1983). This action, in contrast, presents no such concern; indeed, the action will likely not require the Court to second-guess a military decision necessary (or even relevant) to the accomplishment of a military mission. This action will therefore not have a "deleterious impact" on military service. *See Romero*, 954 F.2d at 226; *Del Rio v. United States*, 833 F.2d 282 (11th Cir. 1987) (permitting, after analyzing the *Feres* factors, a claim for damages by a child who survived premature birth allegedly caused when military medical personnel negligently failed to diagnose the servicemember mother of certain pregnancy-related complications).

## 2. Article III Standing.

Defendant separately argues that this Court lacks subject matter jurisdiction because Plaintiff does not have Article III standing. Memo. at 7-9. Central to that position is Defendant's contention that under Virginia law the children do not have, as required for Article III standing, a cognizable "legally protected interest" relative to the insemination procedure that

10

allegedly caused their injuries.[2]  *Id.* (citing *Overy v. Mayor of Baltimore*, 930 F.3d 215, 227 (4th Cir. 2019)).

To establish Article III standing, the Plaintiff must show: "(1) that [the children] suffered an actual or threated injury that is concrete, particularized, and not conjectural; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable decision."  *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 753 (4th Cir. 2013). Defendant contends that Plaintiff cannot establish the first element of constitutional standing— an injury-in-fact—because each child's claim is a "wrongful life" claim which does not exist under Virginia law and therefore, under the alleged facts of this case, "Plaintiff does not—and cannot—assert any 'legally protected interest' that the three minor children had in Plaintiff's insemination."  Memo. at 8.[3]

The Complaint does not characterize any child's claim as a "wrongful life" claim. Likewise, no child alleges that he/she should not have been born, the *sine qua non* of a wrongful life claim.  Rather, each child claims that he/she should not have *died* after birth from injuries

---

[2] The parties do not dispute that Virginia law applies to this action.  *See also Federal Deposit Ins. Co. v. Meyer*, 510 U.S. 471, 478 (1994) (the FTCA's "reference to the law of the place means law of the State" where the act or omission occurred necessary to impose liability occurred) (citing 28 U.S.C. § 1346(b)).

[3] The Supreme Court of Virginia has discussed three types of pregnancy-related torts: a "wrongful birth" action, a "wrongful pregnancy" action, and a "wrongful life" action.  *See generally Miller v. Johnson*, 231 Va. 177, 181, 343 S.E.2d 301, 303 (Va. 1986).  In a "wrongful birth" action, the parents of a defective child seek, on their own behalf, damages resulting from the birth of that child after a failed abortion or after a physician failed to provide to the parents adequate genetic counseling thus depriving the parents of the opportunity to make an informed decision regarding the termination of the pregnancy. In a "wrongful pregnancy" action, the parents of a generally healthy but unwanted child seek, on their own behalf, damages arising from the negligent performance of a failed sterilization procedure or abortion. And in a "wrongful life" action, a defective child seeks, on its own behalf, damages arising from a physician's failure to warn his or her parents of potential defects regarding his or her health or a physician's failure to prevent or terminate the pregnancy in light of known risks.  To date, Virginia courts have only recognized under certain circumstances claims for "wrongful birth" and "wrongful pregnancy."  *Id.  See also Glascock v. Laserna*, 30 Va. Cir. 366 (Va. Cir. Ct. 1993) (declining to recognize a "wrongful life" claim); *Barnes v. Head*, 30 Va. Cir. 218, 221-22 (Va. Cir. Ct. 1993) (holding that because under Virginia law a child does not have a right "'not to be born'. . . in the absence of such a right, it cannot be said that the defendants had a duty to provide to the infant plaintiff the medical services at issue here . . . .").

sustained *in utero* as a result of Defendant's negligence; for that reason, the claims would appear

to be best characterized as "wrongful death" claims, and in fact were so characterized in

Plaintiff's administrative claims to the Navy, filed on behalf of each child.  *See* Memo., Exs. 1-2.

Wrongful death claims are recognized under Virginia law based on negligence, as they are

generally.  *See* Va. Code § 8.01-50.

      Furthermore, there is no doubt that each child sustained an injury-in-fact that is

"concrete, particularized, and not conjectural," *i.e.*, each child's death. *See Public Citizen, Inc. v.*

*Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1292 (D.C. Cir. 2007) (finding "death,

physical injury, and property damage" to be "concrete and particularized injuries" for Article III

standing).  For these reasons, the children's deaths clearly relate to a cognizable protected legal

interest, *i.e.*, the right not to die as a result of another's negligence.

      In substance, Defendant's position incorrectly conflates Article III standing with liability,

contending, in effect, that in the absence of liability, there can be no standing.  But the issue of

whether there is liability under the applicable substantive Virginia law does not bear on whether

the Plaintiff has standing to raise that claim. Therefore, for the foregoing reasons, Plaintiff has

standing to assert a claim on behalf of her deceased children based on Defendant's allegedly

negligently-performed insemination.[4]

### B.  Motion to Dismiss for Failure to State a Claim [Doc. 12]

      Defendant contends that Plaintiffs "cannot state a claim of negligence on behalf of her

minor children for her insemination because her medical providers owed no duty of care to her

hypothetical children at the time of insemination."  Memo. at 10.  Defendant also contends that

---

[4] Defendant does not appear to dispute that, as alleged, the children's injuries are traceable to the Defendant's
alleged negligence and can be redressed by a favorable decision on their claims.

Defendants have failed to adequately allege proximate causation with respect to the negligent failure-to-refer claim. The Court discusses each contention in turn.

1. Whether the children have a claim for *in utero* injuries caused by pre-conception negligence.

"Essential to the recognition of a cause of action in favor of the [children] is the existence of a legal duty owed to them." *Naccash v. Burger*, 223 Va. 406, 414, 290 S.E.2d 825 (Va. 1982). Under Virginia law, that question largely depends on whether someone could, within reason, foreseeably be injured by another's failure to use ordinary care. *See Khadim v. Lab. Corp. of Am.*, 838 F. Supp. 2d 448, 458 (W.D. Va. 2011) (citing *Hall v. Hall*, 240 Va. 360 397 S.E.2d 829 (Va. 1990); *Philip Morris v. Emerson*, 235 Va. 380, 368 S.E.2d 268 (Va. 1988); *S. States Grain Mktg. Coop. v. Garber*, 205 Va. 757, 139 S.E.2d 793 (Va. 1965); *Standard Oil Co. v. Wakefield*, 102 Va. 824, 47 S.E. 830 (Va. 1904)).

The Supreme Court of Virginia has not considered whether to recognize a wrongful death claim under the facts of this case.[5] Thus, the Court's task under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938) is to predict whether the Supreme Court of Virginia would recognize a cause of action against a physician by a person who was injured *in utero* because of the physician's professional negligence that occurred before the person was conceived. Central to that issue is whether a physician can owe a duty to a not-yet-conceived child.[6] Although the Virginia Supreme Court has not addressed whether a medical provider owes a duty of care to a yet-to-be-conceived child, the decisions of the Supreme Court of Virginia, decided under the Virginia

---

[5] The Court is unaware of any court to have addressed this issue under Virginia law.

[6] Plaintiff would, of course, have to satisfy the other elements of such a negligence claim, including a violation of the applicable standard of care and causation, neither of which Defendant contends has not been adequately pled with respect to the intrauterine insemination procedure.

Medical Malpractice Act, ("VMMA"), Va. Code §§ 8.01-581.1 *et seq.*,[7] and otherwise, portend that the Supreme Court of Virginia would recognize such a duty under the facts of this case.

In Virginia, the general rule is that "[a] physician's duty arises only upon the creation of a physician-patient relationship; that relationship springs from a consensual transaction, a contract, express or implied, general or special." *Lyons v. Grether*, 218 Va. 630, 633, 239 S.E.2d 103, 105 (Va. 1977).   In deciding whether there is a physician-patient relationship, Virginia courts have routinely adopted the definition of "patient" under the VMMA. *See, e.g.*, *Didato v. Strehler*, 262 Va. 617, 624 554 S.E.2d 42, 46 (Va. 2001). The VMMA defines a "'[p]atient' [to] mean[] any natural person who receives or should have received health care from a licensed health care provider" and defines "'[h]ealth care' [to] mean[] any act, professional services in nursing homes, or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical diagnosis, care, treatment or confinement."[8]  Va. Code § 8.01-581.1.  The first issue then is whether, under these definitions, the children qualified as "patients" who received "health care" from Plaintiff's treating physician, even though they had yet to be conceived when that treatment was delivered.

In *Kalafut v. Gruver*, 239 Va. 278, 284, 389 S.E.2d 681, 684 (Va. 1990), the Supreme Court of Virginia held that "[a]n action may be maintained [by a child] for recovery of damages for an injury occurring after conception, provided the tortious conduct and the proximate cause

---

[7] Because this FTCA action incorporates Virginia substantive law, the VMMA applies as well. *See Starns v. United States*, 923 F.2d 34, 37 (4th Cir. 1991) (applying the VMMA in a FTCA action involving federally operated health care providers in Virginia); *accord Dunn v. United States VA*, 2019 U.S. Dist. LEXIS 216213, *13, 2019 WL 6842537 (E.D. Va. Dec. 16, 2019) and *Parker v. United States*, 475 F. Supp. 2d 594, 596 (E.D. Va. 2007).

[8] In relevant part, the VMMA defines "health care provider" as "a person . . . licensed by this Commonwealth to provide health care or professional services as a physician . . . ." Va. Code. § 8.01-581.1.  Thus, a physician for purposes of the physician-patient relationship is any licensed physician who provides "health care" to a "patient."  It is not disputed that the treating physician was, at the relevant time, a licensed physician.

14

of the harm can be established."  The Court further concluded that "in context of this case, there is no requirement that the plaintiff be in existence at the time of the negligence, only that it be born alive and suffer from the effects of the injury."  *Id*. at 285.  In *Bulala v. Boyd*, 239 Va. 218, 229, 389 S.E.2d 670, 676 (Va. 1990), the Court recognized that a child, when born alive, becomes a "natural person" and thus a "patient" under the definition provided in the VMMA. And in *Castle v. Lester*, 272 Va. 591, 603 636 S.E.2d 342, 348 (Va. 2006), the Court held that where, as a result of the doctor's negligence, "[] a fetus sustains injury and is subsequently born alive, the mother and impaired child each have a claim for damages resulting from the negligently caused, *in utero* injury."

More recently, the Supreme Court of Virginia confirmed that under the VMMA a child was a "patient" who received "heath care" based on a procedure administered while *in utero*. In *Simpson v. Roberts*, 287 Va. 34, 752 S.E.2d 801 (Va. 2014),[9] the child claimed that she did not meet the definition of a "patient" at the time the doctor performed the allegedly negligent amniocentesis procedure since she was only a fetus *in utero* and not yet a "natural person."  287 Va. at  42.  In rejecting that position, the Supreme Court held that "under this Court's holdings . . . Simpson [the child] became a 'patient' when she was born alive" and the amniocentesis procedure satisfied the "statutory definition of 'health care'."  *Id*. at 805.  Central to that ruling was that "… the amniocentesis was performed, at least in part, for Simpson's benefit to determine whether her lungs [*in utero*] were developed enough that she could be safely delivered."  *Id*.  The Court also clarified that the rule in *Kalafut* pertaining to liability for injuries to a fetus while *in utero* is not "*whether plaintiff could have maintained a personal injury action at the time of [defendant's] negligence,* or whether a fetus can maintain a tort action at the time

---

[9] At issue was whether the child's malpractice claim was subject to VMMA's statutory cap on damages.

an injury is suffered *in utero*," *id*. at 805 (emphasis added), but rather whether, if death had not ensued, a person could have maintained a personal injury action, *id*.

Here, as alleged, each child was injured *in utero* by the negligently administered insemination. And even though that child did not exist when that procedure was administered, that procedure qualified as "health care" since it was administered precisely for the purpose of causing the conception and birth of that child, and for that reason, as in *Simpson*, for the child's benefit. Therefore, under the decisions of the Supreme Court of Virginia, discussed above, each child, once born alive, became a "natural person" and a "patient" who had been injured *in utero* because of a health care provider's negligence. The only open issue is whether the claim the children would otherwise have for those *in utero* injuries are barred because the negligence that produced those injuries pre-dated the child's conception.

The Supreme Court of Virginia has repeatedly emphasized that the critical inquiry for determining whether there is tort liability for prenatal injuries to a fetus is not when the negligence occurred, but whether there was a live birth. *See Kalafut*, 239 Va. at 286 ("in the context of this case, there is no requirement that the plaintiff be in existence at the time of the negligence, only that it be born alive and suffer from the effects of the injury."); *Bulala*, 239 Va. at 229 ("We drew the line between nonliability and liability for prenatal injury at the moment of live birth of the child, when the child became a 'person.'"). Significant in this regard is that the Supreme Court of Virginia has also recognized that a physician can assume a duty of care even in the absence of a then-extant patient-physician relationship. *See Fruiterman v. Granata*, 276 Va. 629, 643-44, 668 S.E.2d 127, 136 (Va. 2008) ("As we recognized in *Didato*, a physician can, in certain circumstances, affirmatively undertake to provide health care to an individual, who

16

prior to that moment was not the physician's patient, and thereby assume the duty to comply with the applicable standard of care.") (citing *Didato*, 554 S.E.2d at 45).

Based on the above discussion, the Court concludes that if presented with this case, the Supreme Court of Virginia would conclude, based on the reasoning and a modest extension of its previous decisions, that the insemination procedure was "health care," as defined under the VMMA; each child had received "heath care;" the treating physician assumed a duty of care to the child intended to be conceived through that health care; once born alive, each child became a "natural person" and a "patient" of the treating physician; and upon their live births, each child had a claim for negligence against the Defendant, even though that negligence (but not the injuries) pre-dated the children's conception.[10]

2. <u>Whether Plaintiff has stated a claim for negligent failure-to-refer.</u>

---

[10] Courts applying the substantive law of other jurisdictions have already concluded that a physician can have liability based on a duty to a not-yet-conceived child, often for acts more temporally remote and less directed to the child than those in this case. *See, e.g.*, *Renslow v Mennonite Hospital*, 67 Ill. 2d 348, 367 N.E.2d 1250 (Ill. 1977) (permitting plaintiff child, born with deformities, to sue mother's physician for botched blood transfusion eight years prior to birth that jeopardized the child's *in utero* health and viability after birth); *Lynch v. Scheininger*, 744 A.2d 113 (N.J. 2000) (same); *Graham v. Keuchel*, 847 P.2d 342 (Okla. 1993) (same); *Lough v. Rolla Women's Clinic*, 866 S.W.2d 851 (Mo. 1993) (en banc) ("[i]t is unjust and arbitrary to deny recovery . . ., simply because [the child] had not been conceived at the time of [the defendant's] negligence."); *Walker v. Rinck*, 604 N.E.2d 591, 592 (Ind. 1992) (recognizing liability to a child based on a doctor's preconception duty to that child for injuries arising from the doctor's negligent failure to properly sensitize the Rh-factor in the mother, the purpose of which was to protect future fetuses from developing injuries *in utero*); *Bergstreser v. Mitchell*, 577 F.2d 22, 28 (8th Cir. 1978) (applying Missouri law) (permitting child who died after birth to bring an action against her mother's physician, alleging that her death was caused by the physician's negligently performed Caesarian section years before, which led to a uterine rupture during the mother's pregnancy with the child); *Martin v. St. John Hospital and Medical Center*, 517 N.W.2d 787, 789-90, 205 Mich. App. 486, 490-94 (Mich. Ct. App. 1st Dist. 1994) (same); *Monusko v. Postle*, 437 N.W.2d 367, 369, 175 Mich. App. 269, 275 (Mich. Ct. App. 1st Dist. 1989) (finding liability based on defendants' failure to administer a rubella test and immunization on the mother prior to her pregnancy, which resulted in the plaintiff child being born with rubella syndrome). *But see Albala v City of New York*, 54 N.Y.2d 269, 429 N.E.2d 786 (N.Y. 1981) (barring a plaintiff child, born with brain damage, from recovering against the mother's physician for the physician's negligence in performing an abortion on the mother years prior to the child's birth, resulting in the mother's perforated uterus that compromised the plaintiff child's health).

Defendant also moves to dismiss Plaintiff's negligence claim for its failure to refer her to a multifetal obstetric specialist, principally on the grounds that the Complaint lacks any factual allegations which raise the reasonable inference that, had C.R.M. been referred to a specialist, the decedent children would have survived.  *See* Compl. ¶¶ 32.d, 33; Reply at 10-12.  The Court agrees.

To assert a medical malpractice claim under Virginia law, "a plaintiff must establish not only that a defendant violated the applicable standard of care, and therefore was negligent, [but] must also sustain the burden of showing that the negligent acts constituted a proximate cause of the injury or death." *Bryan v. Burt*, 254 Va. 28, 34, 486 S.E.2d 536, 541 (Va. 1997).  To prove causation in medical malpractice actions, Virginia law applies the traditional standard of proximate cause, which "require[s] a plaintiff to prove that it is more likely than not that the decedent would have survived in the absence of the defendant's negligence." *Murray v. United States*, 215 F.3d 460, 463, 465 (4th Cir. 2000) (citing *Whitfield v. Whittaker Memorial Hospital*, 210 Va. 176, 169 S.E.2d 563 (Va. 1969)).

Here, Plaintiff alleges that she (and her husband) repeatedly asked military medical personnel to see a multifetal obstetric specialist; Defendant denied those requests; that decision "jeopardiz[ed] the quintuplet pregnancy;" and that the children died shortly after birth.  Compl. ¶¶ 17-23, 27.  However, the Complaint fails to allege any facts raising a reasonable inference that, had Defendant referred Plaintiff to a multifetal obstetric specialist, her treatment would have somehow been different such that there was a "substantial possibility of the [children's] survival." *Murray*, 215 F.3d at 463; *see also Twombly*, 550 U.S. at 570 (the complaint "must be enough to raise a right to relief above the speculative level" to one that is "plausible on its face").

In other words, the Complaint fails to plausibly allege proximate causation.[11]  In fact, Plaintiff's contentions with respect to proximate cause relative to her negligent insemination claim is inconsistent with any plausible allegation that the children's post-birth deaths was caused by the failure-to-refer.  *See* Opp. at 8 ("The doctor's negligence [regarding insemination] resulted in a dangerous quintuplet pregnancy that *all but eliminated* any reasonable likelihood of [the children's] survival[.]") (emphasis added); *id* at 10 ("It cannot be doubted that the conception of five fetuses, which inevitably leads to the birth of children *with little or no chance of survival*, is a foreseeable consequence of a negligently performed insemination procedure.") (emphasis added); *id*. ("Due to that negligence [of the physician], those children had *little or no chance of survival*…[and] the obstetrician's negligence resulted in a dangerous quintuplet pregnancy that *destroyed any substantial possibility* of [the children's] survival.") (emphasis added).

For the above reasons, Plaintiff has failed to allege any facts that make plausible that had the requested referral been made, a different outcome would have resulted.  Accordingly, the Court finds that Plaintiff's failure-to-refer negligence claim fails to state a claim upon which relief may be granted.

## IV.    CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that Defendant's Motion to Dismiss for Lack of Jurisdiction [Doc. 11] be, and the same hereby is, **DENIED**; and it is further

ORDERED that Defendant's Motion to Dismiss for Failure to State a Claim [Doc. 12] be, and the same hereby is, **GRANTED** in part and **DENIED** in part.  The motion is granted with

---

[11] That expert testimony would be required to prove that causation does not excuse Plaintiff's obligation to allege facts that make plausible a claim for relief.

respect to Plaintiffs' claim that Defendant failed to refer C.R.M. to a multifetal obstetric specialist; and is otherwise denied.

The Clerk is directed to forward a copy of this Order to all counsel of record.

_____
/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
August 20, 2020